UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                                   CASE NO. 8:25 cr 177 wf5-spf

EDWARD CANNATELLI                          18 U.S.C. § 371
ROBBYN CANNATELLI                          18 U.S.C. § 1035
THOMAS FARESE                              42 U.S.C. § 1320a–7b(b)
VIRGINIA LOCKETT                           18 U.S.C. § 1349
  a.k.a. VIRGINIA GORDON                    18 U.S.C. § 1519
  a.k.a. VIRGINIA LOCKETT BAITH

SEALED

## INDICTMENT

The Grand Jury charges:

### COUNT ONE
(Conspiracy)

APR 18 2025 AM8:23
FILED - USDC - FLMD - TPA

#### A.    Introduction

At times material to this Indictment:

The Conspirators and Their Enterprises

1.     Edward Cannatelli ("ED CANNATELLI") resided in Broward County, Florida. ED CANNATELLLI caused Mammola Holdings LLC ("Mammola Holdings") to be created in or around March 2019, as a Florida limited liability company. ED CANNATELLI was a listed manager of that company.

2.     Robbyn Cannatelli ("ROBBYN CANNATELLI") resided in Broward County, Florida and was married to ED CANNATELLI. ED CANNATELLI and ROBBYN CANNATELLI caused Dax Consulting Services LLC ("Dax

Consulting") to be created on or around January 1, 2020, and both ED and ROBBYN CANNATELLI were listed as managers of that company. ED and ROBBYN CANNATELLI also owned and/or controlled Cannatelli Builders, Inc., and were the listed officers of Cannatelli Builders, Inc.

3. Thomas Farese ("FARESE") resided in Palm Beach County, Florida. In or about May 2019, FARESE opened and thereafter controlled a bank account in the name of Dakota LLC ("Dakota") at Financial Institution #1 (WF -3964). FARESE identified himself in the pertinent Financial Institution #1 Bank Account Application as Dakota's owner and controller. FARESE caused Complifi LLC ("Complifi") to be created on or about December 5, 2019, as a Florida limited liability company. FARESE was the sole listed manager and registered agent of that company.

4. Virginia Lockett, a.k.a. Virginia Gordon, a.k.a. Virginia Lockett Baith ("LOCKETT"), resided in Broward County, Florida. LOCKETT owned and/or controlled VL Executive Services, LLC ("VLES"). LOCKETT was the sole listed manager and registered agent of that company.

5. Patsy Truglia ("Truglia") resided in Broward County, Florida. As of at least April 9, 2019, ~~and continuing throughout the conspiracy~~, Truglia was subject to T9F VMC 4/17/25 a Temporary Restraining Order ("TRO"), entered in Case No. 8:19-cv-00803-~~CEH~~-AEP. That TRO enjoined Truglia and others from, among other conduct:

> making or submitting or conspiring to make or submit any claims to the
> Medicare program or any health care benefit program, as defined in 18
> U.S.C. § 24(b), in violation of 18 U.S.C. § 371 [conspiracy], 18 U.S.C. § 1347

2

[health care fraud], 18 U.S.C. § 1349 [conspiracy], and/or 42 U.S.C. § 1320a-7b(b) [illegal remunerations], and from committing any federal health care offense as defined under 18 U.S.C. § 24[.]

That TRO was superseded with a Preliminary Injunction on or about May 23, 2019, which continued to enjoin Truglia and others from engaging in the above conduct and from selling or disposing of certain property, absent securing consent to do so from certain authorities.

6.      In or about 2014, Truglia was convicted of a federal felony, to wit, money laundering in violation of 18 U.S.C. § 1956(h) in the United States District Court for the Eastern District of New York. That felony conviction was within 10 years of Truglia acquiring an ownership interest, a partnership interest, or managing control of durable medical equipment ("DME") companies Embrace All LLC ("Embrace All"), Progressive Medical LLC ("Progressive Medical"), and/or Advanced Medical Bracing LLC ("Advanced Medical"), discussed below.

7.      Embrace All was created in or around October 2018 and was originally located in Palm Harbor, Florida. ED CANNATELLI purchased Embrace All and changed its listed principal place of business in or around May 2019 to Tarpon Springs, Florida, in the Middle District of Florida. Embrace All was a Medicare-enrolled DME supply company. As of April 24, 2019, ED CANNATELLI caused himself to be listed in Medicare records as Embrace All's sole owner, authorized official, and managing employee.

8.      Progressive Medical was created in or around November 2018 and was originally located in Largo, Florida. ROBBYN CANNATELLI acquired Progressive

3

Medical in or around July 2019 and changed its listed principal place of business to Palm Harbor, Florida, in the Middle District of Florida. Progressive Medical was a Medicare-enrolled DME supply company. As of July 5, 2019, ROBBYN CANNATELLI was listed in Medicare records as Progressive Medical's sole owner, authorized official, and managing employee.

9. LouTricia Morgan ("Morgan") resided in Sunrise, Florida. Morgan acquired Advanced Medical in or around August 2019, after which she filed Articles of Conversion with the Florida Department of State, Division of Corporations, listing Advanced Medical's principal place of business as Palm Harbor, Florida, in the Middle District of Florida. Advanced Medical was a Medicare-enrolled DME supply company. As of August 15, 2019, Morgan was listed in Medicare records as Advanced Medical's sole owner, authorized official, and managing employee.

10. Morgan also owned and/or controlled T&T Creations of Florida LLC ("T&T Creations"), which was located in Broward County, Florida. T&T Creations, at times, was engaged in telemarketing that targeted Medicare beneficiaries to harvest and/or use the beneficiaries' personal identifying information ("PII") and other information to begin forming DME brace orders.

11. T&T Creations maintained a bank account (BOA -1498) that was used to facilitate the conspiracy. In that regard, proceeds from Embrace All, Progressive Medical, and Advanced Medical were deposited into that T&T Creations bank account and those proceeds were used to promote and fund the conspiracy. Further, proceeds from that T&T Creations bank account were distributed, directly and

4

indirectly, to entities owned or controlled by ED and/or ROBBYN CANNATELLI, FARESE, and Truglia.

12. To conceal Truglia's participation in the conspiracy, Truglia induced an acquaintance, D.M., to allow Truglia to use one or more bank account(s) established and maintained in the name of D.M. Consulting LLC ("DM Consulting") and DM Marketing, registered in December 2019 in Florida as a fictitious name for DM Consulting. Criminal proceeds generated by the conspiracy were distributed to Truglia, at least in part, via checks drafted on the T&T Creations account, made payable to DM Consulting and to DM Marketing. Truglia also maintained and used the email address DMMARKET@protonmail.com for certain conspiratorial exchanges, and he used a mobile phone registered to an account maintained by D.M.

13. Laboratory Marketing Services, LLC ("LMS") was a business based in Palm Beach County, Florida that sold Medicare beneficiary "leads" to T&T Creations for use in its telemarketing efforts.

14. MedTech Worldwide, Inc. ("MedTech"), Real Time Physicians, LLC ("Real Time"), and Conclave Media LLC ("Conclave") were purported "telemedicine" companies.

15. Elise Withall ("Withall") resided in Palm Harbor, Florida, in the Middle District of Florida, where she owned and operated The Withall Group LLC ("The Withall Group"). The Withall Group was a Florida corporation that provided health care billing and consulting services to DME supply companies, including Embrace All, Progressive Medical, and Advanced Medical, among others.

5

16.    Ruth Bianca Fernandez ("Fernandez") resided in Broward County, Florida. Fernandez worked under the direction of ED CANNATELLI, Truglia, and others to facilitate the conspiracy. In that regard, Fernandez was, at times, tasked with handling some of the telemedicine aspects of the conspiracy, in that she submitted electronic information to a telemedicine company, such as MedTech, to gain physicians' signatures on orders in exchange for kickbacks and bribes paid by a conspirator-controlled entity, such as T&T Creations, to the telemedicine company. Once the telemedicine company returned the completed signed DME brace orders, Fernandez forwarded those signed orders and other information to The Withall Group for submission to one or more federal health care benefit programs, such as Medicare, for reimbursement.

17.    ED CANNATELLI, FARESE, and Truglia, in whole or in part, controlled, owned, held a financial interest in, and/or managed aspects of Embrace All, Progressive Medical, and/or Advanced Medical (the "DME Fronts"). The DME Fronts were used to submit claims for payment to Medicare for certain types of DME—knee braces, back braces, shoulder braces, wrist braces, and other braces.

### The Federal Health Care Benefit Programs

*The Medicare Program*

18.    The Medicare program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were age 65 or older, had certain disabilities, or had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

19.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

20.   To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as enrolling DME suppliers into the Medicare program and processing Medicare claims. In performing such functions, MACs were assigned to particular geographical "jurisdictions." For DME claims, they were called Jurisdictions A, B, C, and D.

21.   Medicare was made up of several component "parts" that covered different items and services. Medicare Part A, for example, covered inpatient hospital stays. Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices, referred to as DME (such as the braces referred to above in paragraph 17).

22.   Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

23.   Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC ("CGS"), and (ii) Noridian Healthcare Solutions ("Noridian"). Together, CGS and Noridian are referred to herein as the "DME MACs."

*Medicare Part B Enrollment: The Form CMS-855S*

24.   A different MAC, Palmetto GBA, LLC ("Palmetto"), handled the enrollment of DME suppliers into Medicare. Palmetto was the single entity

responsible for, among other duties, issuing or revoking Medicare supplier billing privileges for DME suppliers. Palmetto was also referred to as the National Supplier Clearinghouse ("NSC") MAC for DME suppliers.

25.    To enroll in Medicare Part B, a DME supplier was required to submit a completed enrollment application—meaning the "Form CMS-855S"—to Medicare. The Form CMS-855S listed many standards necessary to obtain and to retain Medicare billing privileges as a DME supplier.

26.    Pursuant to those standards, a DME supplier was required to provide complete and accurate information on the Form CMS-855S and, further, to report any changes to such information to the NSC MAC within 30 days. The standards also included the following requirements:

a.    an authorized individual (one whose signature was binding) had to sign the application for billing privileges;

b.    a DME supplier was prohibited from direct solicitation to Medicare beneficiaries;

c.    a DME supplier had to maintain a staffed physical facility accessible to the public at least thirty hours per week, with visibly posted hours of operation;

d.    a DME supplier had to disclose any persons having ownership, financial, or control interest in the DME supplier (as further detailed immediately below in paragraphs 27 through 29); and

e.    a DME supplier had to be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number.

27.    The Form CMS-855S required applicants to disclose to Medicare any individual or organization with an ownership interest, a partnership interest, or

8

managing control of a DME supplier. This included (i) anyone or any organization with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) anyone or any organization with a partnership interest in the DME supplier, regardless of the percentage of ownership, (iii) any organizations with "managing control" over the DME supplier, as well as (iv) any and all "managing employees."

28.     "Managing control" was defined on the Form CMS-855S as any organization that exercised operational or managerial control over the DME supplier, or that conducted day-to-day operations of the DME supplier. An organization did not need to have an ownership interest in the DME supplier in order to qualify as a managing organization.

29.     "Managing employee" was defined on the Form CMS-855S (and elsewhere) as any general manager, business manager, administrator, director, or other individual who exercised operational or managerial control over, or who, directly or indirectly, conducted the day-to-day operations of the DME supplier. This included anyone under contract or through some other arrangement, whether or not the individual was a W-2 employee.

30.     The Form CMS-855S also called for extensive information regarding those who owned, managed, and/or controlled (financially or otherwise) the DME supplier. This information included the mandatory disclosure of "Adverse Legal Actions," which was defined to include, among other things, any federal or state felony conviction within 10 years.

9

31.    Finally, the Form CMS-855S required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a–7b(b)[.]
>
> ***
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*On-Site "BOC" and Medicare Inspections*

32.    To enroll in Medicare, a DME supplier was required to complete an accreditation process by an organization approved by CMS. One CMS-approved organization that could perform such accreditation was known as the Board of Certification/Accreditation or the "BOC." The BOC had a set of standards that a DME supplier had to meet for accreditation during on-site inspections and re-inspections.

33.    The NSC MAC also conducted surprise on-site inspections for Medicare enrollment, which helped verify information disclosed in the Form CMS-855S and supporting documents. A DME supplier's responses to the NSC MAC's

10

on-site inspections were recorded, in part, on a Site Investigation for Suppliers of Durable Medical Equipment, Prosthetics, Orthotics and Supplies, Form CMS-R-263. An authorized site inspector would interview staff seeking, among other information, a complete list of all owners and managers and, further, whether they or any of their relatives owned other medical entities.

34.     The NSC MAC inspection also involved a review of any on-site DME inventory. A DME supplier that did not maintain its own inventory could be asked to produce a contract with a third-party vendor, such as a DME "drop-shipping" company.

35.     Further, the NSC MAC inspection inquired about marketing efforts including, pertinently, direct solicitation or the utilization of any third-party to solicit beneficiaries' referrals via telephone.

36.     Finally, all Medicare-enrolled DME suppliers were subject to random re-inspections. During a re-inspection, an inspector could make the same inquiries noted above, request supporting documentation, and seek follow up information from the DME supplier. Failure to comply could result in the suspension or revocation of Medicare billing privileges.

*DME Suppliers' Unique Identification Numbers: NPIs and PTANs*

37.     To bill Medicare, the DME supplier required two unique identification numbers: (i) a "National Provider Identifier" or "NPI," and (ii) a "Provider Transaction Access Number" or "PTAN." To issue NPIs, CMS developed the

11

National Plan and Provider Enumeration System, which assigned NPIs to providers, including DME suppliers.

38.    For PTANs, the NSC MAC was the entity responsible for issuing such identifiers to DME suppliers, but only after approving their Forms CMS-855S. With both the PTAN and the NPI, DME suppliers could submit claims and receive payments from Medicare for braces and other equipment.

*DME Claims Submission under Medicare Part B*

39.    Claims for DME supplies could be submitted for payment to the MAC through an "Electronic Data Interchange ("EDI") system. EDI was a computer-to-computer electronic exchange of business documents using a standard format. An EDI allowed a DME supplier the ability to electronically transmit claims to Medicare in a compliant format. Medicare, in turn, required that a DME supplier complete a Common Electronic Data Interchange ("CEDI") agreement for EDI services with a DME MAC. The CEDI agreement required the DME supplier to agree to several terms and conditions, including:

a.    that it would be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents;

b.    that it would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so, and certify that required beneficiary signatures, or legally authorized signatures on behalf of beneficiaries, were on file;

c.    that it would submit claims that were accurate, complete, and truthful;

d.  that it would affix the CMS-assigned unique identifier number (submitter ID) of the provider on each claim electronically transmitted to the A/B MAC, CEDI, or other contractor if designated by CMS;

e.  that the CMS-assigned unique identifier number (submitter identifier) or NPI constituted the provider's (or the DME supplier's) legal electronic signature and its assurance that services were performed as billed; and

f.  that it would acknowledge that all claims would be paid from Federal funds, that the submission of such claims was a claim for payment under the Medicare program, and that anyone who misrepresented or falsified or caused to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement was, upon conviction, subject to a fine and/or imprisonment under applicable Federal law.

40.  DME claims submitted electronically were required to include certain information relating to a specific patient or beneficiary. The information necessary for a DME claim included:

a.  the type of service provided, identified by an "HCPCS" code (meaning "Healthcare Common Procedure Coding System");

b.  the date of service or supply;

c.  the referring physician's (or other qualified medical professional's, collectively the "medical practitioner's") NPI;

d.  the charge for such services;

e.  patient's diagnosis;

f.  the NPI for the DME entity seeking reimbursement; and

g.  certification by the DME provider that the supplies were medically necessary.

13

41.    Further, in accordance with the applicable Medicare Program Integrity Manual instructions, before submitting a claim for an orthotic brace to the DME MAC, a supplier was required to have on file the following:

a.    written documentation of a verbal order or a preliminary written order from a treating physician;

b.    a detailed written order from the treating physician;

c.    information from the treating physician concerning the beneficiary's diagnosis;

d.    any information required for the use of specific modifiers;

e.    a beneficiary's written assignment of benefits; and

f.    proof of delivery of the orthotic brace to the beneficiary.

42.    Finally, under Medicare Part B, providers were not permitted to routinely waive copayments, which were the portion of the cost of an item paid by a beneficiary.

*CHAMPVA*

43.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was also a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA beneficiaries included the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses or children of veterans who had died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care

14

services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

### B.    The Conspiracy

44.    Beginning on an unknown date, but no later than in or around June 2019, and continuing through in or around at least June 2020, in the Middle District of Florida and elsewhere, the defendants,

EDWARD CANNATELLI,<br>
ROBBYN CANNATELLI,<br>
THOMAS FARESE, and<br>
VIRGINIA LOCKETT,

did knowingly and voluntarily combine, conspire, confederate, and agree with each other and with Truglia, Morgan, and Fernandez, and with others, both known and unknown to the Grand Jury, to:

a.    defraud the United States out of property and money and by impeding, impairing, obstructing, and defeating the lawful functions of HHS, through its agency CMS, in the administration of the Medicare program by deceit, craft, and trickery; and

b.    commit the following offenses against the United States:

i.    making false statements relating to health care matters, in violation of 18 U.S.C. § 1035; and

15

      ii.  offering and paying remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(2).

## C.     <u>Manner and Means of the Conspiracy</u>

45. The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

    a. It was part of the conspiracy that conspirators ED CANNATELLI, ROBBYN CANNATELLI, and Morgan, would and did acquire the three Medicare-enrolled DME Fronts—Embrace All, Progressive Medical, and Advanced Medical, respectively—to, in part:

      i.  enable the conspirators to spread false and fraudulent DME claims submitted to Medicare across the three DME Fronts to evade Medicare scrutiny; and

      ii.  impede, impair, obstruct, and defeat Medicare's ability to administer the program regarding the three DME Fronts.

    b. It was further a part of the conspiracy that the conspirators would and did create and maintain bank accounts for the Medicare-enrolled DME Fronts.

    c. It was further a part of the conspiracy that the conspirators would and did run a telemarketing operation using T&T Creations that targeted the Medicare-aged population to generate DME brace orders.

    d. It was further a part of the conspiracy that the conspirators and others would and did conceal, and caused to be concealed, ED CANNATELLI's, FARESE's, and Truglia's ownership, management, and/or controlling roles in the

DME Fronts, T&T Creations's telemarketing operations, and other aspects of the conspiracy. The concealment efforts included:

i. using T&T Creations, an entity purportedly solely owned and controlled by Morgan, to run telemarketing aspects of the conspiracy;

ii. falsely and fraudulently stating and representing to Medicare and others that ROBBYN CANNATELLI and Morgan were the sole owners, controllers, and/or managers of the DME Fronts Progressive Medical and Advanced Medical, respectively, that were used to facilitate the conspiracy; and

iii. directing the flow of fraud proceeds from the Medicare-enrolled DME Fronts through T&T Creations to other conspirator-controlled entities, including Mammola Holdings, Dax Consulting, Complifi, DM Marketing, and DM Consulting.

e.    It was further a part of the conspiracy that, to target Medicare beneficiaries, the conspirators would and did obtain PII—such as names, dates of birth, and/or Medicare ID numbers—for the Medicare-aged population, including by purchasing that information from one or more known "lead" generator companies, such as LMS.

f.    It was further a part of the conspiracy that the conspirators would and did cause T&T Creations's representatives and/or others working with the conspirators, to call Medicare beneficiaries to inquire about, among other information, the beneficiaries' Medicare eligibility, their health status, and whether they wanted DME braces.

g.    It was further a part of the conspiracy that T&T Creations's representatives and/or others working with the conspirators, would and did make,

and cause to be made, electronic records reflecting the information purportedly exchanged between the representatives and Medicare beneficiaries during calls to those Medicare beneficiaries.

h.    It was further a part of the conspiracy that, through automation and other electronic means, the conspirators would and did cause the transmission of electronic records to one or more purported "telemedicine" vendor(s), such as MedTech, used to build unsigned Medicare beneficiaries' DME brace orders.

i.    It was further a part of the conspiracy that the conspirators would and did offer and pay illegal kickbacks and bribes through the purported "telemedicine" vendor(s) to medical practitioners to induce the practitioners to prescribe and sign the false and fraudulent DME brace orders under the guise of telemedicine.

j.    It was further a part of the conspiracy that, often without ever contacting the Medicare beneficiaries, the medical practitioners would and did sign the false and fraudulent DME brace orders.

k.    It was further a part of the conspiracy that, pursuant to the conspirators' arrangements with purported "telemedicine" vendor(s), the vendor(s) would and did electronically transmit, or cause to be transmitted, signed false and fraudulent DME brace orders, secured through illegal kickbacks and bribes, to the conspirators as support for fraudulent, illegal DME claims.

l.    It was further a part of the conspiracy that the conspirators would and did forward, and cause to be forwarded, bogus documentation, including the

18

signed false and fraudulent DME brace orders, to The Withall Group or another entity working with the conspirators as support for fraudulent, illegal DME claims that were submitted by The Withall Group or other entity on behalf of the DME Fronts to Medicare.

m.    It was further a part of the conspiracy that the conspirators would and did transmit, or caused to be transmitted, interstate wire communications to help carry out the conspiracy, specifically including the transmission of interstate wire communications associated with the submission of fraudulent, illegal DME claims made by the DME Fronts to Medicare for processing and payment.

n.    It was further a part of the conspiracy that the conspirators would and did direct, or cause to be directed, Medicare and CHAMPVA payments for fraudulent, illegal DME claims to DME Front bank accounts.

o.    It was further a part of the conspiracy that one or more of the conspirators would and did transfer, or caused to be transferred, fraud proceeds from the DME Front bank account(s) and/or a T&T Creations bank account, sometimes in three equal shares, to other companies' bank accounts controlled by ED and/or ROBBYN CANNATELLI (i.e., Mammola Holdings and Dax Consulting), FARESE (i.e., Dakota and/or Complifi), and Truglia (i.e., DM Consulting and/or DM Marketing).

p.    It was further part of the conspiracy that the conspirators would and did participate in meetings, perform acts, and make statements to accomplish the objects of and to conceal the conspiracy, including the creation of sham, backdated

documents: (i) a "Simple Agreement" between Morgan and ED and ROBBYN CANNATELLI, (ii) an Independent Contractor Safe Harbor Personal Services Agreement for Paralegal Affairs between Embrace All and Complifi, and (iii) an Independent Contractor Safe Harbor Personal Services Agreement for Paralegal Affairs between Progressive Medical and Complifi.

### D.    Overt Acts

46.    In furtherance of the conspiracy, and to effect its objects, the defendants and other conspirators committed the following overt acts, among others, in the Middle District of Florida and elsewhere:

a.    On or about June 19, 2019, conspirator ED CANNATELLI sent an email to conspirator FARESE regarding "Advanced Medical Bracing_LOA," with an attached Letter of Agreement between Advanced Medical Bracing ("Seller") and Edward Cannatelli ("Buyer"), signed by the Seller, and an attached Letter of Agreement between Progressive Medical Bracing ("Seller") and "Entity to be determined ('Seller')," signed by the Seller.

b.    On or about July 3, 2019, conspirator ED CANNATELLI sent an email to Withall regarding "STOCK PURCHASE AGREEMENT PROGRESSIVE" that stated:

**Owner will be Robbyn Cannatelli**

c.    On or about July 3, 2019, Withall sent an email to conspirators ED CANNATELLI and LOCKETT that stated:

20

Ed,

**UPDATE: wire for the $ for Both DME's to**

**Wire Instructions:**
**Bank of America**
**The Withall Group, LLC**
**Account #: XXX-XX-XXX-4977**
**Routing #: XXX-XXX-593**

      d.      On or about July 6, 2019, conspirator ED CANNATELLI sent an email to conspirator FARESE regarding an "Updated Invoice-PMB" that explained:

Tom,

> Please see expenses to date for the new entity. I opened the account yesterday with $100.00 and I will deposit an additional $5,900.00, [s]o we will be in at an additional $2k each.

Edward Cannatelli

      e.      On or about July 10, 2019, a conspirator caused a $10,000 check (#3067) to be sent to The Withall Group in the Middle District of Florida, noting that the check was for "Advanced Med Bracing Stock Purch."

      f.      On or about July 17, 2019, conspirator ED CANNATELLI forwarded an email—originally sent by Withall—to conspirator FARESE regarding "AMB-Stock Purchase Agreement 2017" that stated:

Tom,

> Please see amended stock purchase agreement showing the $10k deposit, which was deposited into the account yesterday, and the balance of $45k due at PTAN receipt.

> I will get Loutricia to execute if agreeable.

21

g.     On or about July 19, 2019, conspirator FARESE sent an email to conspirator ED CANNATELLI regarding "Advanced Medical Bracing_LOA" that stated:

> **Just a little concerned this guy is not in trouble or worse, is something else. We will know Monday**
>
> **Tommy**

h.     On or about July 20, 2019, conspirator ED CANNATELLI, as the "Owner" of Progressive Medical, signed a Retail Lease Agreement on behalf of "Progress" Medical to lease office space for the DME Front at a Palm Harbor, Florida location.

i.     On or about August 12, 2019, conspirators caused wire transfers of $30,000 and $15,000 to be sent to The Withall Group in the Middle District of Florida, associated with the acquisition of Advanced Medical.

j.     On or about the dates set forth below, each of which constitutes a separate overt act, one or more conspirators signed, or cause to be signed, Medicare enrollment application Forms CMS-855S for the DME Fronts, which, in part, bound the DME suppliers and their officials to abide by all "laws, regulations, and program instructions" for Medicare, including "the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)":

| Overt Act | On or About Date of Signature/Signer | DME Front |
|-----------|--------------------------------------|-----------|
| j.1 | July 5, 2019 Robbyn Cannatelli | Progressive Medical |
| j.2 | August 15, 2019 LouTricia Morgan | Advanced Medical |

22

k.    On or about the dates set forth below, each of which constitutes a separate overt act, one or more conspirators caused funds to be distributed from the specified DME Front to The Withall Group:

| Overt Act | On or About Date | DME Front Account | Type | Amount |
|---|---|---|---|---|
| k.1 | May 21, 2019 | Embrace All (BOA -7448) | Transfer Debit | $2,104.95 |
| k.2 | August 8, 2019 | Progressive Medical (BOA -4202) | Transfer Debit | $1,993.44 |
| k.3 | November 6, 2019 | Embrace All (BOA -7448) | Transfer Debit | $10,000.00 |
| k.4 | November 6, 2019 | Progressive Medical (BOA -4202) | Transfer Debit | $450.00 |
| k.5 | February 7, 2020 | Advanced Medical (BOA -0103) | Debit | $2,500.00 |
| k.6 | February 28, 2020 | Advanced Medical (BOA -0103) | Debit | $2,500.00 |
| k.7 | March 19, 2020 | Progressive Medical (BOA -4202) | Transfer Debit | $5,000.00 |
| k.8 | March 24, 2020 | Embrace All (BOA -7448) | Transfer Debit | $6,000.00 |
| k.9 | March 27, 2020 | Advanced Medical (BOA -0103) | Debit | $2,500.00 |

l.    On or about September 30, 2019, conspirators ROBBYN CANNATELLI, on behalf of Progressive Medical, and LOCKETT (as Virginia Gordon), on behalf of VLES, entered into a Management Services Agreement.

m.    On or about December 27, 2019, a conspirator caused an invoice for $10,000 purportedly from DM Marketing—listing "400 Diabetic HMO/PPO ages 18-63" at a rate of $25.00—to Progressive Medical (referencing conspirator ED CANNATELLI) to be paid.

23

n.    On or about the dates set forth below, each of which constitutes a separate overt act, one or more conspirators caused funds to be distributed from a T&T Creations bank account to the specified entities owned and/or controlled by ED and/or ROBBYN CANNATELLI, FARESE, and Truglia:

| Overt Act | On or About Date | Source Account/ Distribution To | Wire/ Check No. | Amount |
|---|---|---|---|---|
| n.1 | October 29, 2019 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $15,000 |
| n.2 | November 5, 2019 | T&T Creations (BOA -1498) To DM Consulting | 1008 | $15,000 |
| n.3 | November 4, 2019 | T&T Creations (BOA -1498) To Dakota | 1009 | $15,000 |
| | | | | |
| n.4 | November 7, 2019 | T&T Creations (BOA -1498) To DM Consulting | 1012 | $10,000 |
| n.5 | November 12, 2019 | T&T Creations (BOA -1498) To Dakota | 1013 | $10,000 |
| n.6 | November 8, 2019 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $10,000 |
| | | | | |
| n.7 | December 10, 2019 | T&T Creations (BOA -1498) To DM Consulting | 1032 | $15,000 |
| n.8 | December 5, 2019 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $15,000 |
| n.9 | December 17, 2019 | T&T Creations (BOA -1498) To Complifi | 1038 | $15,000 |
| | | | | |
| n.10 | December 13, 2019 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $20,000 |
| n.11 | December 27, 2019 | T&T Creations (BOA -1498) To Complifi | 1043 | $20,000 |
| n.12 | December 18, 2019 | T&T Creations (BOA -1498) To DM Marketing | 1045 | $20,000 |

24

| Overt Act | On or About Date | Source Account/ Distribution To | Wire/ Check No. | Amount |
|---|---|---|---|---|
| | | | | |
| n.13 | December 27, 2019 | T&T Creations (BOA -1498) To Complifi | 1051 | $15,000 |
| n.14 | December 23, 2019 | T&T Creations (BOA -1498) To DM Marketing | 1052 | $15,000 |
| n.15 | December 20, 2019 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $15,000 |
| | | | | |
| n.16 | January 3, 2020 | T&T Creations (BOA -1498) To DM Marketing | 1068 | $7,000 |
| n.17 | January 10, 2020 | T&T Creations (BOA -1498) To Complifi | 1069 | $7,000 |
| n.18 | January 3, 2020 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $7,000 |
| | | | | |
| n.19 | January 10, 2020 | T&T Creations (BOA -1498) To DM Marketing | 1076 | $5,000 |
| n.20 | January 21, 2020 | T&T Creations (BOA -1498) To Complifi | 1077 | $5,000 |
| n.21 | January 10, 2020 | T&T Creations (BOA -1498) To Mammola Holdings | Wire | $5,000 |

o.    On or about February 6, 2020, conspirator ED CANNATELLI sent an email to a representative of The Withall Group, copying conspirators ROBBYN CANNATELLI and LOCKETT, and others, regarding a maximum brace limit for DME Front customers.

p.    On or about the dates set forth below, each of which constitutes a separate overt act, a conspirator paid, or caused to be paid, the specified kickbacks

and bribes to MedTech, a purported "telemedicine" company, to induce medical practitioners to prescribe and sign DME brace orders:

| Overt Act | On or About Date | Source Account/ Receiving Company | Approx. Amount |
|---|---|---|---|
| p.1 | October 15, 2019 | T&T Creations (BOA -1498) To MedTech | $5,700 |
| p.2 | October 21, 2019 | T&T Creations (BOA -1498) To MedTech | $2,500 |
| p.3 | October 25, 2019 | T&T Creations (BOA -1498) To MedTech | $3,000 |
| p.4 | January 24, 2020 | T&T Creations (BOA -1498) To MedTech | $13,625 |
| p.5 | January 31, 2020 | T&T Creations (BOA -1498) To MedTech | $14,450 |
| p.6 | April 24, 2020 | T&T Creations (BOA -1498) To MedTech | $27,835 |
| p.7 | April 27, 2020 | T&T Creations (BOA -1498) To MedTech | $5,000 |
| p.8 | April 30, 2020 | T&T Creations (BOA -1498) To MedTech | $15,000 |

q.     On or about April 2, 2020, conspirator ED CANNATELLI sent an email to Withall and conspirator LOCKETT, copying conspirator FARESE, regarding "Embrace All Invoice 4.1.20" that stated:

**Elise,**

**I cannot open these files. Please send in an excel format along with all applicable ERN's so I can have my CFO and accountant review.**

r.     On or about April 2, 2020, conspirator FARESE replied to an email from conspirator ED CANNATELLI regarding "Embrace All Invoice 4.1.20" that stated:

**Noting attached.**

26

s.    On or about April 14, 2020, conspirator ED CANNATELLI sent an email with an attached notice to Withall, copying conspirator Morgan, conspirator LOCKETT, and conspirator ROBBYN CANNATELLI, regarding "Certified Mail-Breach of Contract" that stated:

**Elise,**

**Please see attached.**

t.    On or about April 9, 2020, conspirator Morgan sent an email to conspirator ED CANNATELLI regarding "Bills" that stated:

**Advanced Bills For The Week**

| | |
|---|---|
| Telemed "Conclave" | $5,000.00 |
| Andrew "Shipper" | $7,000.00 (est have not got his invoice) |
| Valerie- | $6,000.00 (she owes 16 at the moment) |
| Payroll- | $6,400.00 |
| Leads RK-(live transfer) | $3,000.00 |
| Leads Nico (live transfer) | $1,625.00 (keep in holding in case he produce better) |
| Telemed "MedTech" | $5,000 (paid already 04/08/20) |
| <u>Transferring Fees</u> | <u>$210.00</u> |
| Total | $29,235.00 |

u.    On or about April 26, 2020, conspirator Truglia sent an email from DMmarket@protonmail.com to conspirator ED CANNATELLI regarding "Bracing Issues" that stated:

**Good morning buddy I'm just getting a chance to go over all of these emails and I seen that you aske a question about Pverify. No matter what anybody says to you Pverify is not the same as noridsn or CGS. If that's the only thing that we had to use then so be .,,it but it's about 40% off accuracy.**

**You have to be a real deal bracing establishment like we are to get CGS and noridian.**

27

     v.     On or about April 28, 2020, conspirator Morgan sent an email to conspirator ED CANNATELLI, copying Truglia at DMMARKET@protonmail.com and conspirator LOCKETT, regarding "Concerns" that stated:

> **Good Afternoon All,**
>
> **Below are Clients that were submitted to a Telemed on behalf of EA, PMB or AMB, listed below you will find the Marketer, Telemed, Date of Submission, Date DO Received, Date Billed & what was billed.**

     w.     On or about April 29, 2020, conspirator Morgan sent an email to conspirator ED CANNATELLI, copying Truglia at DMMARKET@protonmail.com and conspirator LOCKETT, regarding "Braces No Pay-Let's get credit from marketer and braces returned" that stated:

> **Good Morning All,**
>
> **On it.**

     x.     On April 30, 2020, conspirator ED CANNATELLI directed Morgan to copy ED CANNATELLI and FARESE with Morgan's email communication and provided Morgan with an email address for FARESE.

     y.     On or about May 5, 2020, conspirator FARESE replied to an email from conspirator ED CANNATELLI regarding "Proposal" that stated:

> **She wants a bit for the proposal. But she provides more attention and *folderol* document support for window dressing, which is good for the branding of NEWCO. While most of this stuff is available from any Human Resource consultant (or firm) and or the National Human Resource Association it is great to have on file and on display and on website.**
>
> **But don't pick a name with "brace" in it. Keep it more mainstream healthcare.**

**Let talk.**

**Tommy**

z.  On or about June 4, 2020, conspirator ED CANNATELLI directed Morgan to pay the $2911.80 "rent for Palm Harbor."

All in violation of 18 U.S.C. § 371.

## COUNT TWO
### (Wire and Health Care Fraud Conspiracy)

### A.  Introduction

1.  The Grand Jury realleges and incorporates by reference Part A of Count One of this Indictment as if fully set forth herein.

### B.  The Conspiracy

2.  Beginning on an unknown date, but no later than in or around June 2019, and continuing through in or around at least June 2020, in the Middle District of Florida and elsewhere, the defendants,

> EDWARD CANNATELLI,
> ROBBYN CANNATELLI,
> THOMAS FARESE, and
> VIRGINIA LOCKETT,

did knowingly and voluntarily combine, conspire, confederate, and agree with each other and with Truglia, Morgan, and Fernandez, and with others, both known and unknown to the Grand Jury, to commit:

a.  wire fraud, in violation of 18 U.S.C. § 1343; and

b.  health care fraud, in violation of 18 U.S.C. § 1347.

29

### C.    The Manner and Means of the Conspiracy

3.    The manner and means by which the conspirators sought to accomplish the objects of the conspiracy are set forth in Part C of Count One of this Indictment, the allegations of which are realleged and incorporated by reference as if fully set forth herein.

All in violation of 18 U.S.C. § 1349.

## COUNT THREE
### (Falsification of Records in Federal Investigations)

### A.    Introduction

1.    The Grand Jury realleges and incorporates by reference Part A of Count One of this Indictment as if fully set forth herein.

### B.    The Charge

2.    In or around June 2020, in the Middle District of Florida and elsewhere, the defendants,

EDWARD CANNATELLI,
ROBBYN CANNATELLI, and
VIRGINIA LOCKETT,

along with LouTricia Morgan, knowingly covered up, falsified, and made a false entry in a record and document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in contemplation of such matter, within the jurisdiction of a department and agency of the United States, namely the United States Department of Health and Human Services and its Office of Inspector General in an ongoing health care fraud investigation, by creating and

30

submitting to that investigation in response to a Grand Jury subpoena a sham, backdated "Simple Agreement" between Morgan and ED CANNATELLI and ROBBYN CANNATELLI.

In violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2.

## COUNT FOUR
### (Falsification of Records in Federal Investigations)

### A.    Introduction

1.    The Grand Jury realleges and incorporates by reference Part A of Count One of this Indictment as if fully set forth herein.

### B.    The Charge

2.    On or about June 23, 2020, in the Middle District of Florida and elsewhere, the defendants,

> EDWARD CANNATELLI,
> THOMAS FARESE, and
> VIRGINIA LOCKETT,

knowingly covered up, falsified, and made a false entry in a record and document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in contemplation of such matter, within the jurisdiction of a department and agency of the United States, namely the United States Department of Health and Human Services and its Office of Inspector General in an ongoing health care fraud investigation, by creating and submitting to that investigation in response to a Grand Jury subpoena a sham, backdated Independent Contractor Safe Harbor Personal Services Agreement for Paralegal Affairs between Embrace All and Complifi,

31

signed by ED CANNATELLI and FARESE on behalf of Embrace All and Complifi, respectively.

In violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2.

## COUNT FIVE
### (Falsification of Records in Federal Investigations)

### A.    Introduction

1.    The Grand Jury realleges and incorporates by reference Part A of Count One of this Indictment as if fully set forth herein.

### B.    The Charge

2.    On or about June 16, 2020, in the Middle District of Florida and elsewhere, the defendants,

ROBBYN CANNATELLI,
THOMAS FARESE, and
VIRGINIA LOCKETT,

knowingly covered up, falsified, and made a false entry in a record and document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in contemplation of such matter, within the jurisdiction of a department and agency of the United States, namely the United States Department of Health and Human Services and its Office of Inspector General in an ongoing health care fraud investigation, by creating and submitting to that investigation in response to a Grand Jury subpoena a sham, backdated Independent Contractor Safe Harbor Personal Services Agreement for Paralegal Affairs between Progressive Medical and

Complifi, signed by ROBBYN CANNATELLI and FARESE on behalf of Progressive Medical and Complifi, respectively.

In violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2.

## FORFEITURE

1.     The allegations contained in Counts One and Two of this Indictment are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a).

2.     Upon conviction of any or all of the violations alleged in Counts One and Two, the defendants shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3.     Upon conviction of any or all of the violations alleged in Count One and Two, the defendants shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

4.     The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of proceeds the defendant obtained as a result of the commission of the offenses.

5.     If any of the property described above, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

33

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

A TRUE BILL,

Foreperson

GREGORY W. KEHOE
United States Attorney

By: _____
Tiffany E. Fields
Assistant United States Attorney

By: _____
Jay G. Trezevant
Assistant United States Attorney

By: _____
Carlton C. Gammons
Assistant United States Attorney
Chief, Economic Crimes Section

34

FORM OBD-34

April 25

No.

## UNITED STATES DISTRICT COURT
### Middle District of Florida
### Tampa Division

THE UNITED STATES OF AMERICA

vs.

EDWARD CANNATELLI, ET AL

INDICTMENT

Violations:   18 U.S.C. § 371
18 U.S.C. § 1349
18 U.S.C. § 1519

A true bill,

███████████████████

Foreperson

Filed in open court this 17TH day

of April, 2025.

_____

Clerk  Karina Nieves

Bail $_____

GPO 863 525